**Opinion issued June 20, 2019**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-19-00007-CV

_____

## IN THE INTEREST OF Z.M.L., A CHILD

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2015-07438J

## MEMORANDUM OPINION

D.M.F. appeals the trial court's judgment terminating his parental rights to his seven-year-old daughter, Z.M.L. In two issues, D.M.F. contends there is legally and factually insufficient evidence to support the predicate finding under Section 161.001(b)(1)(E) and the best-interest finding under Section 161.001(b)(2) of the Family Code. We affirm.

Background

**A.    Department seeks termination of parental rights to three half-siblings**

In December 2015, Michelle,[1] gave birth to a boy, Michael, who tested positive for cocaine. The Department of Family and Protective Services was alerted and began proceedings for conservatorship over Michael and his two half-sisters, Serena (age six) and Zoey (age five). The Department's petition named Michelle as the mother of all three children; it identified a separate father for each child. The petition stated that the three identified fathers "either are in prison or their whereabouts are unknown." The court granted the Department's petition and placed the children under the Department's temporary conservatorship in January 2016. The Department pursued termination of all parents' parental rights.

The man named as Zoey's father proved not to be. It is unclear from this record when the Department and trial court became aware that he was not Zoey's father. But, in November 2016, the trial court ordered DNA testing on Dante, who was serving a six-year prison sentence out-of-state. The DNA testing established

---

[1]    All parties to this appeal and their family members will be referred to by pseudonyms as follows:

| Initials | Pseudonym | Relationship to child who is subject of suit |
|----------|-----------|----------------------------------------------|
| Z.M.L.   | Zoey      | Subject child    |
| D.M.F.   | Dante     | Biological father |
| M.N.L.   | Michelle  | Biological mother |
| S.K.L.   | Serena    | Half-sister |
| M.R.M.   | Michael   | Half-brother |
| L.M.F.   | Layla     | Paternal grandmother |

that Dante is Zoey's biological father, but it is unclear when the Department received these test results.[2]

The Department moved forward with termination of all parents' parental rights without adding Dante to the termination suit. The petition, instead, sought to terminate the parental rights of Zoey's "unknown father."

At some point, again, the timing is unclear from the record, Dante's mother, Layla, intervened to seek custody of Zoey, the only of Michelle's children to whom she was related. For the first two-or-so years, the Department arranged visits between Layla and Zoey. The Department stopped all visitations when it discovered that Layla had arrest warrants stemming from traffic violations. Layla "took care of" the warrants, but the Department never permitted the visits to resume. Layla continued with her efforts to obtain custody of Zoey. The Department continued to pursue placement with a nonrelative, adoptive foster parent.[3]

The parental rights of Michelle, the identified fathers of Serena and Michael, and Zoey's "unknown father" were terminated in March 2017. Because the

---

[2]     Trial testimony from Dante's mother, Layla, indicated that the family always knew Dante to be Zoey's father because Layla was significantly involved in Zoey's life since birth.

[3]     The Department caseworker testified that the foster parent was initially presented as a relative of the children. The Department later determined that she is not a relative. This revelation did not alter the Department's conservatorship or permanency goals.

3

Department never added Dante to the suit, his parental rights were not terminated by that judgment.

**B.      Department seeks termination of Dante's parental rights to Zoey**

About eight months later, in November 2017, the Department petitioned to terminate Dante's parental rights to Zoey. It listed multiple bases for termination, including Subsections (C) (abandonment), (D) (endangering conditions), (E) (endangering conduct), (K) (voluntary relinquishment), (N) (constructive abandonment), (O) (failure to comply with court order establishing actions necessary for return of child), and (Q) (criminal conduct resulting in imprisonment for two or more years).

Around the same time—while Dante was serving a six-year sentence in federal prison—the Department initiated a Family Service Plan detailing tasks and goals for Dante to demonstrate his ability to provide for the safety and well-being of Zoey. The Plan required Dante, among other things, to avoid criminal activity, complete parenting classes and a psycho-social evaluation, and maintain stable housing and employment.

The record does not contain any additional pleadings or filings related to the Department's efforts to terminate Dante's parental rights. In October 2018, the trial court held the termination hearing.

## C.    Trial

The one-day trial to terminate Dante's parental rights included four witnesses and seven exhibits. The four witnesses were I. Darrington (Department caseworker), B. Waddell (Child Advocates volunteer), Layla (Zoey's paternal grandmother, who was seeking custody of Zoey), and K. Douglas (foster parent, who was seeking to adopt Serena, Zoey, and Michael). Trial began with the Department explaining that it did not serve Dante in the earlier termination suit, therefore, a second termination proceedings was required.

### 1.    I. Darrington—Department caseworker

The Department caseworker, Darrington, testified that Zoey was seven years old at the time of trial and living with a foster parent who intended to adopt Zoey, Serena, and Michael. She stated that Dante was incarcerated in a Louisiana federal prison for possession of a firearm following a conviction for a felony, with an anticipated release date in 2021.

Darrington was asked about Dante's "extensive criminal history." Counsel for the Department listed dates and names of offenses, and Darrington agreed they were part of Dante's criminal history. Darrington did not differentiate between offenses that led to convictions and those that were dismissed. Nor did she testify whether the offenses were for misdemeanors or felonies. She also did not explain that some of the charges identified were multi-jurisdictional prosecutions for single

criminal acts. The State admitted into evidence various indictments and judgments that provided additional information about the listed charges. To summarize, Dante pleaded guilty to four misdemeanors (possession of marijuana, carrying a weapon, resisting arrest, and criminal trespass) between 2010 and 2011, which would have been while Michelle was pregnant with Zoey and during the first year of her life. He pleaded guilty to two felonies (unauthorized use of a vehicle and evading arrest) in 2012 and another felony (theft) in 2013. Those criminal acts and guilty pleas led to jail sentences of between 10 days and 9 months each. Also in 2013, Dante pleaded guilty to misdemeanor assault of a family member/dating relationship and felony theft. Then, between August 2013 and June 2014, Dante was charged with two additional misdemeanors (possession of marijuana and burglary of a motor vehicle) and three felonies (robbery with a deadly weapon, possession of a firearm by a felon, and a separate possession of a firearm by a felon). Those last five charges were all dismissed in favor of federal prosecution on two counts of being a felon in possession of a firearm. After pleading guilty to the firearms charges, Dante was sentenced to six years in federal prison. Dante was serving that sentence at the time of trial.

Darrington next discussed Layla's involvement in the case. Darrington agreed that Zoey had spent roughly "80% of the time" living with Layla instead of her mom before the children's removal by the Department. She also agreed that

Layla had been consistently involved in the conservatorship case, appeared at all hearings, and steadfastly sought custody of Zoey. She stated that Layla "absolutely" had been a good grandmother to Zoey and had always had "positive" monthly visits with Zoey from 2015—when the Department became involved—until early 2018. But, in February 2018, the Department learned that Layla had arrest warrants stemming from a driving offense. The arrest warrants were for driving with a revoked license, failure to identify, and, subsequently, failure to appear. Darrington agreed that Layla "took care of" the warrants, which led to an August 2018 court order requiring Layla to perform 64 hours of community service.

Darrington testified that the Department denied Layla any visitation with Zoey once it discovered the warrants. She confirmed the warrants were "the only reason" visitations were stopped. Yet, the visits did not resume after Layla successfully "took care of" the warrants.

Darrington conceded that Layla's having warrants was not "a threat to the health and safety" of Zoey. She further conceded there was nothing in Layla's past "that would prevent her from legally having custody of" Zoey. In fact, in support of her efforts to obtain custody of Zoey, Layla had applied to be a foster parent. After conducting a home study, a child-placement agency approved Layla to be a foster parent. Nonetheless, according to Darrington, the Department decided not to

7

pursue placement with Layla because "it's in the best interest for the children to remain together," which meant remaining with the foster placement.

Darrington's testimony criticized Layla in one regard. She stated that Layla's visits with Zoey, during the first years of the conservatorship suit, "created a division in the current caregiver's home," in that Zoey was "experiencing behaviors and saying things to the other children that made her feel that she was a little bit more inferior than the other children." The Department concluded that the household "division" and behavior problems were caused by Zoey's visits with Layla.

Darrington testified that Dante—who was in federal prison—had been provided a Family Service Plan by the Department but had not completed any of its requirements. According to Darrington, Dante never responded to her efforts to communicate with him and never sent any letters or gifts to Zoey.

Darrington stated that Dante's position was that his mother, Layla, should have Zoey. But, according to Darrington, Zoey wanted to stay with her current caregiver and be adopted along with her siblings.

In conclusion, Darrington testified that it was in Zoey's best interest to be adopted by her current caregiver and for Dante's parental rights to be terminated. She stated that the adoptive foster parent had been meeting Zoey's needs and providing for her for three years. Darrington reiterated the Department's position

8

that "it's important that we maintain the sibling relationship." She testified that a therapist had recommended the children stay together and had counseled that "an adoption not including all of [the siblings] could have a detrimental effect on [Zoey]," but she acknowledged the unnamed therapist would not be testifying at trial. The Department did not offer the therapist's notes, written recommendations, or any other related material as evidence at trial.

### 2. B. Waddell—Child Advocates volunteer

The second witness was B. Waddell, who is a Child Advocates volunteer. She testified that she never contacted Dante, but, "based on his charges and his long history of his criminal record," she believed "he would not be a good parent."

Waddell elaborated on the perceived negative effects of Layla's earlier visits with Zoey. She stated that Zoey had "substantial behavior issues" around the time of Layla's visits and "basically regressed" after them. And Zoey's solo visits with Layla—without her siblings—were causing issues for the foster family.

Waddell also testified that she, in her role as a Child Advocates volunteer, had had negative, "caustic" interactions with Layla, who she described as "irate" and "upset" that she "was being neglected in all of this." Child Advocates supported termination of Dante's parental rights and unrelated adoption of Zoey and her two half-siblings by the current foster parent. It was Child Advocates's recommendation that Zoey not be separated from her siblings.

9

### 3.    Layla—paternal grandmother

The third witness was Layla. She testified that she had been involved in Zoey's life since birth. Zoey would spend lengths of time living with Layla between stays at Michelle's home. Layla ensured that Zoey was safe and healthy and that she went to doctor appointments.

After the Department became involved, Layla felt she was being treated like "a suspect." Visitations were difficult to schedule. Later, they were stopped because of outstanding traffic warrants, which she resolved.

Layla was asked about the Department's stated interest in keeping the sibling group together. She testified that she was willing to ensure Zoey had a continuing relationship with her half-siblings. She also noted that the sibling group actually was not being kept together. Layla testified that Michelle had a fourth child while the termination suit was pending, and that fourth child was being raised by another family member in Dallas, away from Zoey and the other half-siblings. Layla testified that she had been told the fourth child was elsewhere because the foster parent, who was seeking to adopt Serena, Zoey, and Michael, "didn't want to start over." Layla noted that she was asking for Zoey what the Department was allowing for the fourth child: living with a biological relative apart from half-siblings. Layla testified that she would be willing to ensure Zoey continued her relationship will all four of her half-siblings.

Finally, Layla testified that Zoey "knows her father" and misses him. She did not provide any context or elaborate on these statements.

On cross-examination, Layla was asked about the criminal history of her three sons. She agreed that Dante and her youngest son had been incarcerated, but she disputed the suggestion that their criminal histories "go to [her] parental ability."

### 4. Foster parent

The final witness was the foster parent who was seeking to adopt Zoey and two of her half-siblings. She briefly testified that she wanted to adopt all three children and wanted them to stay together. She was open to the possibility of Zoey having a relationship with Layla "maybe in the future." She asked the trial court to terminate Dante's parental rights so she could "move forward" with adopting Serena, Zoey, and Michael.

## D. Rendition of judgment

After the foster parent testified, the trial court rendered judgment terminating Dante's parental rights under Subsection (E) for endangering conduct and approving Zoey's placement with the foster parent. Several weeks later, the trial court entered a final judgment terminating Dante's parental rights to Zoey, "dismissing" Layla's intervention, and ordering that Layla "take nothing" from the suit. Dante appealed. Layla did not.

**Termination of Parental Rights**

Dante challenges the sufficiency of the evidence supporting termination of his parental rights.

**A.    Standard of review**

A parent's rights to the "companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). A termination decree is final, irrevocable, and permanently divests the parent of all legal rights, privileges, duties, and powers with respect to the parent-child relationship, except for the child's right to inherit. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Id.* But "the rights of natural parents are not absolute," and "the rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Recognizing that parents may forfeit their parental rights by their acts or omissions, the primary focus of any termination suit is protection of the child's best interest. *Id.*

Due to the severity and permanency of the termination of parental rights, the evidence supporting termination must meet the threshold of clear and convincing evidence. TEX. FAM. CODE § 161.001(b); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex.

2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. This is an intermediate standard that falls between "preponderance of the evidence" used in ordinary civil proceedings and "reasonable doubt" used in criminal proceedings. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).

This heightened burden of proof mandates a heightened standard of review. *In re S.R.*, 452 S.W.3d 351, 358 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). When the legal sufficiency of the evidence supporting termination is challenged, the reviewing court looks at all the evidence in the light most favorable to the termination finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *In re J.F.C.*, 96 S.W.3d at 265–66. The court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. It should disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. If, after conducting a legal-sufficiency review of the record evidence, the court determines that no reasonable factfinder could have formed a firm belief or conviction that the matter to be proved was true, the court

13

must conclude that the evidence on that matter is legally insufficient. *In re J.O.A.*, 283 S.W.3d at 344–45; *In re J.F.C.*, 96 S.W.3d at 266.

Only when the factual sufficiency of the evidence is challenged does the reviewing court review disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345; *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266. We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

## B. Predicate finding—Subsection (E) endangering conduct

The trial court terminated Dante's parental rights to Zoey under Subsection (E) of the Family Code. Subsection (E) provides for termination of parental rights if the parent has "engaged in conduct . . . which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). Within

14

the context of Subsection (E), endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *Id.*; *see In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996).

It is not necessary to establish that a parent intended to endanger a child to support termination under Subsection (E). *See In re M.C.*, 917 S.W.2d at 270. Nor is it necessary to establish that the parent's conduct was directed at the child or caused actual harm; rather, it is sufficient if the parent's conduct endangers the child's well-being. *See Boyd*, 727 S.W.2d at 533; *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Danger to a child's well-being may be inferred from parental misconduct. *Boyd*, 727 S.W.2d at 533; *K.P.*, 498 S.W.3d at 171. "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Conduct may be endangering even when it does not occur in the child's presence. *In re A.D.M.*, No. 01-16-00550-CV, 2016 WL 7368075, at *6 (Tex. App.—Houston [1st Dist.] Dec. 20, 2016, pet. denied) (mem. op.). A parent's past endangering conduct may support an inference that

15

past conduct may recur and further jeopardize the child's present or future physical or emotional well-being. *See In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.); *see also In re A.D.M.*, 2016 WL 7368075, at *6.

The court's endangerment analysis includes consideration of a parent's criminal record and how repeated criminal activity adds instability to the child's life with repeated parental incarceration and separation. *See Boyd*, 727 S.W.2d at 533–34 (stating that "imprisonment is certainly a factor to be considered by the trial court on the issue of endangerment"). While "mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child," "if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding [under Subsection] (E) is supportable." *Id.*; *see In re V.V.*, 349 S.W.3d 548, 554–55 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (en banc) (affirming termination of father's parental rights under Subsection (E) for endangering conduct, noting his "extensive criminal history," repeated "criminal conduct leading to incarceration before and after the child's birth," "life of crime" that included four felonies as well as "assault and other crimes against the person," "no effort to care for his daughter when not incarcerated," and "irresponsible choices that deprived this child of a parent"). The conclusion that a parent's criminal conduct endangers—rephrased in *Boyd* as

jeopardizes—the well-being of a child "can be inferred from parental misconduct" itself. *Boyd*, 727 S.W.2d at 533 (in reversing judgment of court of appeals, stating that Court "expressly disapprove[s]" of intermediate court's "holding that danger cannot be inferred from parental misconduct").

Dante's past criminal conduct includes no less than eight episodes of illegal activity leading to criminal convictions.[4] These include a 2013 misdemeanor assault when Zoey was one and one-half years old and two separate 2014 felony counts of possession of a firearm by a felon when Zoey was two years old. *Cf. In re V.V.*, 349 S.W.3d at 554–55 (concluding father endangered child through criminal acts that included multiple felonies and crimes against people).

Each episode of illegal activity subjected Dante to incarceration if convicted, which, in turn, jeopardized Dante's ability to provide for Zoey, parent her, or meet her physical and emotional needs. *See In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.–Houston [14th Dist.] 2003, pet. denied) (in Subsection (E) analysis, stating that father created "emotional vacuum" in child's life, which endangered child's emotional well-being, by being absent due to incarceration while other parent was unable to care and support child); *In re A.A.M.*, 464 S.W.3d 421, 426–27 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (in Subsection (E) analysis, holding that

---

[4] This number does not include charges that were dismissed at the prosecutor's discretion, including a 2007 felony capital-murder charge and a 2013 felony robbery-with-a-deadly-weapon charge. Nor does it include secondary charges and convictions that arose from the same days' events.

father's criminal offenses "significantly harm the parenting relationship" and "can constitute endangerment even if the criminal conduct transpires outside the child's presence," no matter that parent was noncustodial at time of criminal conduct); *cf. In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (stating that father's "extensive criminal history involving drugs and assault" and general absence from child's life without emotional or financial assistance to child "exhibited a pattern of conduct that is inimical to the very idea of child-rearing").

Of Dante's convictions, one was for assault of a person with whom Dante had a dating relationship. Specifically, he was charged with and pleaded guilty to "punching the complainant with his fist" when Zoey was two years old. *See D.N. v. Tex. Dep't of Family & Protective Servs.*, No. 03-15-00658-CV, 2016 WL 1407808, at *2 (Tex. App.—Austin Apr. 8, 2016, no pet.) (mem. op.) ("[D]omestic violence may constitute endangerment, even if the violence is not directed at the child.").

A reasonable trier of fact could reach a firm belief or conviction that these episodes of criminal conduct—which include assaultive acts, family violence, and repeated acts of illegal possession of a firearm—subjected Dante to incarceration and absence from Zoey's life and endangered Zoey's well-being. We conclude the trial court did not err in determining that factually and legally sufficient evidence

supports termination of Dante's parental rights under Subsection (E), so long as doing so was in Zoey's best interest.

## C.    Best-interest finding

Along with a predicate violation, the Department was required to establish by clear and convincing evidence that termination was in Zoey's best interest. TEX. FAM. CODE § 161.001(b)(2). There is a strong presumption that a child's best interest will be served by preserving the parent-child relationship. *In re J.F.C.*, 96 S.W.3d at 294; *see* TEX. FAM. CODE § 153.131(b). Because of the strong presumption that maintaining the parent-child relationship is in the child's best interest and the due process implications of terminating a parent's rights without clear and convincing evidence that termination is in the child's best interest, "the best interest standard does not permit termination merely because a child might be better off living elsewhere. Termination should not be used to merely reallocate children to better and more prosperous parents." *In re W.C.*, 98 S.W.3d 753, 758 (Tex. App.—Fort Worth 2003, no pet.); *see In re E.N.C.*, 384 S.W.3d 796, 809 (Tex. 2012).

A factfinder may consider several factors to determine the child's best interest, including the child's desires, the child's present and future physical and emotional needs, the present and future emotional and physical danger to the child, the parental abilities of the people seeking custody, programs available to assist

those people in promoting the child's best interest, plans for the child by those people or by the agency seeking custody, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

The absence of evidence on some factors does not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The absence of evidence cannot be used as if it were clear and convincing evidence supporting a termination finding. *In re E.N.C.*, 384 S.W.3d at 808. In some cases, undisputed evidence of only one factor may be sufficient to support a finding that termination is in the child's best interest; in other cases, there could be "more complex facts in which paltry evidence relevant to each consideration mentioned in *Holley* would not suffice" to support termination. *In re C.H.*, 89 S.W.3d at 27. Our "best interest" analysis is not limited to these *Holley* factors; other factors may be considered. *Holley*, 544 S.W.2d at 372.

"A best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). "A trier of fact

may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*

### 1. Child's desires

Darrington testified that Zoey, who was seven years old at the time of trial, wanted to remain with her foster parent and be adopted along with her two half-siblings.

Layla testified that Zoey knows and misses Dante. Darrington testified otherwise, though not on direct knowledge. Darrington was asked if Zoey had a relationship with Dante before the Department's involvement. She responded: "I don't know that she has. According to the mother, she does not." Whether Dante had a relationship with Zoey before the Department's involvement, the evidence indicates that he did not have any relationship, or even contact, with Zoey during the two years the case was pending. Darrington testified that Dante did not send any letters to Zoey from prison. There is no evidence that he tried to contact Zoey; instead, his focus has been on supporting his mother's efforts to obtain visitation and custody of Zoey.

The trial court is the sole arbiter of credibility and was free to disbelieve Layla's assertion that there was an existing relationship between Dante and Zoey before the Department's involvement and to further disbelieve any inference that

Zoey might choose to maintain a parent-child relationship with Dante. *See In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam).

2. **Parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one and any excuse for those acts or omissions**

Dante has had many criminal convictions. While several were non-violent crimes that led to sentences of three months or less, three were felony offenses. Because of the felony convictions, Dante is legally prohibited from possessing a firearm. Yet, he was convicted of doing so twice in 2014, which subjected him to a substantial prison sentence. These offenses were after his conviction for assaulting (specifically, by punching) a woman he was dating. Dante provided no mitigation or context for these offenses.

Parental behaviors like assaulting a person within one's emotional circle and choosing to possess deadly weapons while specifically prohibited from doing so because of past felony convictions can place the parent-child relationship at risk, in part because the behaviors subject the parent to incarceration and separation from their child. *See In re V.V.*, 349 S.W.3d at 555, 558. Moreover, the violent nature of some of Dante's offenses raises the possibility that children in his presence will be subjected to violence even if the violent acts are not directed specifically at them. *See Walker*, 312 S.W.3d at 619 (considering father's past violence in best-interest assessment and noting that evidence of endangering conduct under Subsection (E)

22

is also probative of best-interest analysis) (citing *In re C.H.*, 89 S.W.3d at 28). The insecurity and instability in Dante's life, as a result of his criminal activity and incarceration, is contrary to the notion that Dante has striven to provide a safe and stable home for Zoey or to provide—directly, not by proxy—for her emotional well-being. Dante's past criminal actions are not conducive to a healthy parent-child relationship.

The evidence, though sparse, indicates that Dante has had no contact with Zoey for the past two-plus years. While his incarceration explains a lack of in-person contact, it does not fully explain his failure to contact Zoey by email, letter, or phone to further a relationship with her. Dante's failure to seek any level of contact with Zoey further indicates the absence of a proper parent-child relationship.

### 3.   Parenting abilities of people seeking custody

Often, this *Holley* factor leads to an analysis of the parenting abilities of the parents who are appealing the termination of their parental rights and the foster parents who are seeking to adopt the child. This case is different. Dante has challenged the termination of his parental rights but has also argued that, if his rights are terminated, custody of Zoey should be granted to his mother, Layla.

Layla intervened in this suit to seek custody of Zoey. She undertook all necessary steps and was approved as a foster placement. Yet, the Department

23

would not place Zoey with her. Layla, though, continued to attend every hearing and appeared at trial. Layla sought custody of Zoey. But the trial court dismissed her intervention and entered judgment that she take nothing in the suit. Layla has not appealed the trial court's ruling.

In Dante's appeal, he seeks to reurge custody being granted to Layla. This is a decision, though, that the Department rejected months, if not years, before trial. The Department determined that Zoey's interests were best served by pursuing a sibling placement with an unrelated, adoptive foster parent versus a placement with a paternal grandmother who was unrelated to Zoey's half-siblings. Whether the Department properly evaluated those two options months before trial is not before us. Whether the trial court erred in denying Layla the relief she requested in her petition in intervention—which is not in the appellate record—also is not before us because Layla did not appeal the trial court's judgment denying her any relief. This Court has no authority to reweigh the interim placement decisions of the Department. Without Layla appealing, we also have no authority to review the sufficiency of the evidence supporting the trial court's ruling that Layla take nothing from this suit.

For these reasons, we have concluded that our best-interest analysis cannot include an evaluation of whether Zoey's interests would be best served by placement with her paternal grandmother, Layla. Instead, in the context of this

24

*Holley* factor, which evaluates the parenting abilities of those seeking custody, we are constrained to evaluate the parenting abilities of Dante and the adoptive foster parent.

Harrington testified that the foster parent has met Zoey's needs and provided for her for three years. The foster parent has facilitated Zoey's growth and development. Waddell testified that the foster parent is taking a strong interest in all three children's behavior and education. The children's relationships with each other have improved. They are doing "much better" in school. The foster parent has "demonstrated a history of being an exceptional parent" with her biological children. Waddell testified that the foster parent also has been an "exceptional parent" to Zoey and, in her opinion, will continue to be in the future.

Harrington testified that Dante has not shown any parenting abilities. He has not completed any services required through his Family Service Plan, which was created to establish parental ability to provide for children's ongoing safety and well-being. He also has not responded to Harrington's efforts to contact him to discuss his "interests" in this case.

Dante, for his part, did not present any evidence of his own parenting history or abilities. His position was more in support of his mother's efforts to obtain custody of Zoey.

**4. Child's present and future physical and emotional needs and danger**

Harrington and Waddell testified that the Department's position, consistent with a past therapist's recommendation, is that Zoey's emotional needs will be best met by maintaining the same home environment as Serena and Michael. Harrington testified that the three siblings "depend on each other developmentally" and it would not be in Zoey's interest to separate them. Waddell agreed.

There is no evidence to indicate that Dante is able to provide for Zoey's future physical and emotional needs. The record indicates that he wished to rely on Layla to provide for Zoey. As mentioned though, our review cannot be based on that possibility, which the Department has rejected, the trial court has denied, and Layla has not appealed.

**5. Available programs for conservators to promote best interest of child**

This factor was not a focus of trial testimony. There is no indication the foster parent would rely on programs in her effort to promote Zoey's best interest.

Dante did not avail himself of any services under his Department Family Service Plan, but it is unclear on this record how much access to services he had from prison. For that reason, we cannot say that the record supports an inference one way or the other about the prospect of services being available to help Dante to promote Zoey's best interests in the future.

**6.     Parent's and the Department's plans for child**

The Department's plan for Zoey is that she be adopted by her foster parent, along with Serena and Michael, and that she be raised in a loving, stable home with these two half-siblings.

Dante's plan for Zoey is that she be placed with his mother while he is incarcerated and, if all parental rights are terminated, that Zoey be adopted by his mother. But Dante's plan is not a viable option for our consideration on appeal.

**7.     Conclusions on best interests**

Considering the evidence in light of these *Holley* factors, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination of Dante's parental rights was in Zoey's best interest. We therefore conclude that the evidence was sufficient to support the trial court's best-interest finding. We overrule Dante's second issue.

## Conclusion

Having concluded that sufficient evidence supports the trial court's judgment, we affirm.

Sarah Beth Landau
Justice

Panel consists of Justices Lloyd, Landau, and Countiss.